LUCILLE E. KISTNER, f/k/a LUCILLE E. WEASEL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kistner v. Commissioner
Docket No. 32084-87
United States Tax Court
T.C. Memo 1991-463; 1991 Tax Ct. Memo LEXIS 512; 62 T.C.M. (CCH) 787; T.C.M. (RIA) 91463; September 23, 1991, Filed *512 Decision will be entered under Rule 155. Jerald S. Beer and Patrick J. Casey, for the petitioner. Claudine D. Ryce, for the respondent. SWIFT, Judge. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in petitioner's Federal income tax liabilities of $ 533,391 for 1979 and $ 1,166,011 for 1980. After concessions and settlement of a number of issues, respondent revised his deficiency determinations as follows: $ 219,092 for 1979; $ 682,748 for 1980. The primary issues for decision are whether petitioner and/or her then husband, George E. Weasel, Jr., received constructive dividends from a family-owned corporation, and whether petitioner -- who filed with her former husband joint Federal income tax returns for 1979 and 1980 -- is entitled to relief as an innocent spouse under section 6013(e)[1] from any tax deficiency sustained herein. FINDINGS *513 OF FACT Some of the relevant facts have been stipulated and are so found. Petitioner resided in West Palm Beach, Florida, at the time of filing her petition in this case. On December 5, 1943, at the age of 17, petitioner married George E. Weasel, Jr. Petitioner's formal education ended after the 11th grade, and Mr. Weasel's formal education ended after the 8th grade. Between 1945 and 1960, petitioner and Mr. Weasel had six children. In 1945, Mr. Weasel organized a business to grow, pack, and market radishes. This business operated under the name of Tem-Cole. From approximately mid-October to mid-May of each year, Tem-Cole grew radishes on leased land in Belle Glade, Florida. From approximately mid-May to mid-October of each year, Tem-Cole grew radishes on leased land in Sturgis and Kalamazoo, Michigan. After harvesting, the radishes were transported to McClure, Ohio, where Tem-Cole operated a processing plant to sort and package the radishes. Although petitioner occasionally worked in the radish processing plant in McClure, Ohio, petitioner was never involved in the financial, management, or legal aspects of Tem-Cole. In 1956, at a cost of $ 80,000, Mr. Weasel had a family *514 residence built for himself, for petitioner, and for their children on 10 acres of land adjacent to Route 65 in McClure, Ohio, across the highway from Tem-Cole's radish processing plant. Sometime after 1956, a swimming pool, a tennis court, a clubhouse, and an airplane landing strip were constructed adjacent to the residence. The tennis court, clubhouse, and landing strip apparently were located on a separate parcel of property. In 1957, Mr. Weasel incorporated Tem-Cole. Of the 60,000 shares of Tem-Cole stock originally issued, 59,754 shares were issued to Mr. Weasel, 156 shares were issued to petitioner, and 90 shares were issued to Mr. Weasel's father. In subsequent years, Mr. Weasel made annual gifts of Tem-Cole stock to his wife and children. Mr. Weasel, however, was the president of Tem-Cole and in all years controlled all aspects of Tem-Cole's business. On January 22, 1974, petitioner and Mr. Weasel entered into a marital separation and support agreement, and on March 17, 1977, petitioner and Mr. Weasel were divorced. Under the terms of the property settlement agreement entered into incident to the divorce, in addition to receiving child support, petitioner was to receive *515 $ 225,000 each year as "guaranteed income," consisting of $ 100,000 in cash dividends which petitioner and Mr. Weasel anticipated would be paid on petitioner's shares of Tem-Cole stock and $ 125,000 in cash which would be paid to petitioner by Mr. Weasel. The property settlement agreement directed that if the cash dividends petitioner received from Tem-Cole amounted in any given year to less than $ 100,000, Mr. Weasel would pay petitioner the difference. If petitioner's Tem-Cole cash dividends amounted to more than $ 100,000, Mr. Weasel would pay petitioner a correspondingly lesser amount. In any event, petitioner was to receive a combined total of $ 250,000 in cash each year from Tem-Cole and from Mr. Weasel. On March 19, 1977, as agreed to in the property settlement agreement, Mr. Weasel conveyed to petitioner by quitclaim deed his interest in the residence located in McClure, Ohio. By the time of the divorce in 1977, petitioner owned 3,456 shares of Tem-Cole class B nonvoting stock, and each of the Weasel children owned 1,650 shares of Tem-Cole class B nonvoting stock. By 1977, Tem-Cole had become the largest producer of radishes in the United States, harvesting each year *516 20 square miles of radishes and selling radishes in every part of the country except the Southeast. On October 17, 1978, petitioner entered into an amended property settlement agreement with Mr. Weasel under which she agreed to convey her ownership interest in the residence in McClure, Ohio, back to Mr. Weasel, and under which petitioner also agreed to convey to Tem-Cole her ownership interest in the property on which the swimming pool, the tennis court, and the clubhouse were located. In exchange, Mr. Weasel agreed to convey to petitioner a residence of comparable value not to exceed a cost of $ 250,000. In spite of the divorce in 1977, during late 1978 and early 1979, petitioner and Mr. Weasel both continued to live at the residence in McClure, Ohio, and Mr. Weasel did not convey to petitioner the residence contemplated in the amended property settlement agreement. On March 5, 1979, petitioner and Mr. Weasel were remarried. During the 1979 and 1980 winter growing seasons, petitioner and Mr. Weasel resided together in Atlantis, Florida, at a condominium apparently paid for by Tem-Cole. During the 1979 and 1980 summer growing seasons, petitioner and Mr. Weasel resided together *517 at the residence in McClure, Ohio. During the years in issue, Mr. Weasel was involved with several other business activities and investments (namely, the breeding and racing of horses and several real estate limited partnerships in Texas). During 1979 and 1980, petitioner also owned interests in real estate limited partnerships from which she received income in the amounts of $ 11,494 and $ 17,229, respectively. In August of 1980, the George Weasel Consolidated Holding Co. Inc. (the holding company), was formed for the purpose of owning and managing all of the various aspects of Tem-Cole's business, as well as some of Mr. Weasel's other business interests such as his investments in racehorses and real property. The stock of the holding company was exchanged for the outstanding stock of Tem-Cole. Mr. Weasel received class A voting stock, and the other shareholders received class B nonvoting stock. For convenience we continue to refer to the holding company as Tem-Cole. Between July of 1979 and December of 1980, petitioner accompanied Mr. Weasel on trips on one of Tem-Cole's two airplanes. Most of the trips related to Mr. Weasel's work for Tem-Cole or to his other business interests, *518 but a significant number of the airplane trips were personal in nature. Petitioner had no particular business reason for accompanying her husband on any of the trips. During the years in issue, petitioner was not an employee or officer of Tem-Cole, although she occasionally ran various business-related errands for Mr. Weasel and for Tem-Cole such as picking up business associates from the airport. Petitioner enjoyed a lavish lifestyle, spending as much as $ 9,000 a month to purchase for herself designer clothes and jewelry. In 1979, 1980, and early 1981, petitioner received from Mr. Weasel a monthly cash allowance of $ 15,000, which she was free to spend however she chose. Petitioner and Mr. Weasel traveled frequently throughout the United States, Europe, and the Caribbean. In each of 1979 and 1980, Mr. Weasel bought petitioner a new Mercedes automobile. As petitioner stated -- I'd have to say it was a very lavish life-style, [we] maintained two beautiful homes, one in the North and one in the South; had all the jewelry, clothes, designer clothes that I wanted. I guess I had anything I wanted. We traveled extensively, on the Concord, on George's Lear, attended horse races *519 all over the country, spent vacations in Europe, always went first class every place we went. * * *
Many of petitioner and Mr. Weasel's large personal expenses, some of which are mentioned above, were routinely paid by Tem-Cole, including personal trips on Tem-Cole's and on commercial airplanes, personal meals at restaurants and country clubs, gasoline, family groceries, pianos, flowers, lawn sprinkler systems, and a tennis ball throwing machine to name just a few. Although Mr. Weasel had a drawing account with Tem-Cole through which Mr. Weasel reimbursed Tem-Cole for some of the personal expenses of petitioner and Mr. Weasel that Tem-Cole had paid, the record does not begin to establish the extent of such reimbursements to Tem-Cole. During 1979 and 1980, Fred and Elsie Robichaud were paid wages or salaries by Tem-Cole. The Robichauds lived near the Weasels' residence in Florida during the winter growing season, and they lived in a trailer home on the grounds of petitioner and Mr. Weasel's residence in McClure, Ohio, during the summer growing season. In return for the wages or salaries received from Tem-Cole, Fred Robichaud worked primarily as a handyman and gardener in the *520 yards and gardens of the Weasels' residences, and Elsie Robichaud cleaned and performed domestic work inside the residences. The Robichauds ran errands and incurred expenses for such things as groceries, flowers, and dry cleaning on behalf of the Weasels personally, for which expenses the Robichauds generally were reimbursed by Tem-Cole. In April of 1981, petitioner and Mr. Weasel separated for the second time, and they were divorced again in November of 1983. On February 15, 1983, petitioner filed a lawsuit against Mr. Weasel on behalf of herself and other minority shareholders of Tem-Cole. In the lawsuit, petitioner claimed that Mr. Weasel was depleting the property of Tem-Cole by, among other things, drawing an excessive salary, using funds of Tem-Cole to pay for personal travel, entertainment, and living expenses, and by diverting corporate property to Mr. Weasel's other unrelated businesses. The allegations in the complaint were not limited to any specific time frame, but obviously included 1979 and 1980. Tem-Cole maintained its financial books and records on the basis of a fiscal year ending September 30. Petitioner and Mr. Weasel signed and filed joint Federal income *521 tax returns for 1979 and 1980. Both returns were prepared by accountants hired by Mr. Weasel. On their 1979 Federal income tax return, the Weasels reported wage income from Tem-Cole in the amount of $ 482,417, miscellaneous income of $ 100,313, losses from horse breeding and racing activities of Mr. Weasel of $ 178,003, losses from various partnerships of $ 898,379, and itemized deductions of $ 22,548, for a net loss of $ 516,200. On their 1980 Federal income tax return, the Weasels reported wage income from Tem-Cole in the amount of $ 400,000, miscellaneous income of $ 309,267, losses from various partnerships and other business interests of $ 1,003,768, losses from horse breeding and racing activities of $ 201,664, and itemized deductions of $ 15,972, for a net loss of $ 512,137. On audit, respondent determined that in 1979 and 1980, petitioner and Mr. Weasel received additional income of $ 1,142,681 and $ 1,386,135, respectively, relating to unreimbursed payments by Tem-Cole for petitioner and Mr. Weasel's personal benefit (or relating to the use by petitioner and/or by Mr. Weasel of Tem-Cole's corporate property). This additional income for each year was treated by respondent *522 as constructive dividends from Tem-Cole to petitioner and/or to Mr. Weasel. Respondent also determined that Mr. Weasel's horse breeding and racing activities were not engaged in for profit, and respondent disallowed the losses associated therewith. For 1980, respondent further determined that petitioner and Mr. Weasel received additional interest income in the amount of $ 5,818. Following trial and in light of documentation supplied by Tem-Cole as to business use of the company airplanes, respondent adjusted his determination of the constructive dividends from Tem-Cole, and respondent concluded that petitioner and/or Mr. Weasel received $ 851,050 and $ 897,423 in constructive dividends from Tem-Cole in 1979 and 1980, respectively. Also, respondent conceded that Mr. Weasel's horse breeding and racing activities were engaged in for profit, and respondent allowed a deduction for the losses claimed in connection therewith. OPINION Constructive Dividends
Section 61 defines gross income as income from whatever source derived, including compensation for services, gross income from business, and dividends. A dividend is any property distributed by a corporation to its shareholders, *523 whether or not the corporation formally declares a dividend or even intends to distribute a dividend. Loftin and Woodard, Inc. v. United States, 577 F.2d 1206, 1214 (5th Cir. 1978); Crosby v. United States, 496 F.2d 1384, 1388 (5th Cir. 1974). Accordingly, an expenditure made by a corporation for the personal benefit of shareholders, or the personal use by shareholders of corporate property may result in the receipt by the shareholders of constructive dividends. Ireland v. United States, 621 F.2d 731, 735 (5th Cir. 1980); Commissioner v. Riss, 374 F.2d 161, 170 (8th Cir. 1967); Nicholls, North, Buse Co. v. Commissioner, 56 T.C. 1225, 1238 (1971). In determining whether constructive dividends have been received, the key factors are whether the shareholders received economic benefits from the corporation without expectation of payment therefor ( Ireland v. United States, supra at 735; United States v. Smith, 418 F.2d 589, 593 (5th Cir. 1969)), and whether the company-provided benefits made available to the shareholders were primarily of a *524 personal nature rather than in the business interests of the corporation. Ireland v. United States, supra at 735; Loftin and Woodard, Inc. v. United States, supra at 1215-1217; United States v. Gotcher, 401 F.2d 118, 121 (5th Cir. 1968). Petitioner contends that the bulk of any personal economic benefits received in relation to payments made by Tem-Cole were realized not by her but by Mr. Weasel, and therefore that she should not be charged with income with respect thereto. Petitioner also contends that personal expenses paid by Tem-Cole were reimbursed by Mr. Weasel. Petitioner further contends generally that amounts allowed by respondent as business deductions to Tem-Cole (which corporation was audited separately by respondent for its 1979 and 1980 taxable years) should not be treated in this case as the payment by Tem-Cole of petitioner and Mr. Weasel's personal expenses. Tem-Cole regularly paid personal expenses of petitioner and Mr. Weasel, and petitioner and Mr. Weasel frequently used Tem-Cole corporate property for their personal benefit. It is clear that petitioner and Mr. Weasel received from Tem-Cole *525 significant constructive dividends through the payment by Tem-Cole of their personal expenses and through the personal use of Tem-Cole's property that were not reflected on petitioner and Mr. Weasel's joint Federal income tax returns for 1979 and 1980. With the exception of items already conceded by respondent, no credible evidence has been offered by petitioner of a legitimate business purpose for the expenses in question, nor for the use by petitioner and Mr. Weasel of Tem-Cole's property. Petitioner's general testimony that Mr. Weasel repaid Tem-Cole for some of the personal expenses is not sufficient evidence that Mr. Weasel did so as a regular practice or that he did so for the items still in dispute. Further, petitioner's general allegations relating to the settlement Tem-Cole reached with respondent concerning Tem-Cole's corporate deductions does not provide an adequate basis for reducing the constructive dividends charged to petitioner and Mr. Weasel in this case. For 1979 and 1980, petitioner voluntarily signed joint Federal income tax returns with her husband, and she is therefore jointly and severally liable under section 6013(d)(3) for the income tax deficiencies arising *526 from income attributable either to herself or to Mr. Weasel during the years in issue (unless she is entitled to relief under the innocent spouse provisions of section 6013(e)). We hold for respondent with regard to the adjustments to petitioner and Mr. Weasel's income for 1979 and 1980 that are still in issue. Innocent Spouse
Relief from joint Federal income tax liability may be available under section 6013(e)(1), the general requirements of which are that: (1) The joint tax returns contain substantial understatements of tax attributable to "grossly erroneous items of one spouse;" (2) the other ("innocent") spouse did not know and had no reason to know of the substantial understatements when he or she signed the returns; and (3) based on all the facts and circumstances it would be inequitable to hold the innocent spouse liable for the deficiencies in question. Failure to prove that any one of the requirements has been met will disqualify taxpayers from relief under section 6013(e). Stevens v. Commissioner, 872 F.2d 1499, 1504 (11th Cir. 1989), affg. a Memorandum Opinion of this Court. With regard to the first requirement, respondent has stipulated *527 that many of the constructive dividends received from Tem-Cole accrued primarily to the personal benefit of Mr. Weasel and, to that extent, such omitted income is attributable to Mr. Weasel, and qualifies as grossly erroneous items. Petitioner, however, also benefitted from numerous nonbusiness-related trips on Tem-Cole's and on commercial airplanes, from the personal, nonbusiness-related services of the Robichauds, and from other items. To that extent, the constructive dividends do not qualify as grossly erroneous items attributable to Mr. Weasel. With regard to the second requirement, petitioner claims that she did not know of the substantial understatements. As indicated, however, the second requirement of section 6013(e)(2) also requires that petitioner must have had no reason to know of the substantial understatements. The standard to be used here is whether a reasonably prudent person in the taxpayer's position had reason or would be expected to know that the correct joint tax liabilities were underreported on the tax returns or that further inquiry was warranted. Stevens v. Commissioner, supra at 1505; Sanders v. United States, 509 F.2d 162, 167 (5th Cir. 1975). *528 Factors relevant in the determination of whether a spouse had reason-to-know of the understatements include such spouse's level of education and involvement in the family business, the presence of unusual or lavish expenditures during the years in issue, and the other spouse's evasiveness and deceit with regard to the family finances. Stevens v. Commissioner, supra at 1505, and cases cited. A spouse's role as homemaker and deference to the other spouse's judgment in financial matters are generally not sufficient reasons, standing alone, to find that a spouse had no reason to know of the understatements. Stevens v. Commissioner, supra at 1505-1506; Shea v. Commissioner, 780 F.2d 561, 566-567 (6th Cir. 1986), affg. on this issue and revg. and remanding a Memorandum Opinion of this Court. In the instant case, petitioner was not a high school graduate, and she was not significantly involved in the family business or family finances. We believe, however, that even a cursory review of the joint Federal income tax returns for the years in issue, reflecting significant net losses, would and should have alerted petitioner *529 to make further inquiry, especially considering the lavish personal expenditures being made by petitioner and by Mr. Weasel. Although petitioner may have been fearful of angering Mr. Weasel, she does not claim that she was coerced into signing the returns or that she did so under duress. In the lawsuit petitioner filed in 1983 initiating the shareholder lawsuit against Mr. Weasel and Tem-Cole, petitioner acknowledged that she was aware of Mr. Weasel's misuse of Tem-Cole's corporate property during the years in issue. Under the facts and circumstances of this case, we conclude that petitioner does not qualify as an innocent spouse under section 6013(e)(2). Petitioner may have been ignorant of the precise tax implications of the payments being made by Tem-Cole on her and Mr. Weasel's behalf, but she was or should have been aware of the payments, and she had a duty to make further inquiry as to the proper tax treatment thereof. Having found that petitioner does not meet the second requirement of section 6013(e)(2), we need not address the third requirement. Petitioner does not qualify for relief as an innocent spouse under section 6013(e). Decision will be entered under Rule *530 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect for the years in issue.↩